2018 IL App (1st) 171534
No. 1-17-1534
Opinion filed September 28, 2018

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JAMESON REAL ESTATE, LLC, and ART COLLAZO, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 2014 L 10486 |
| AQUEEL AHMED and EURO COLLISION, INC., | ) ) ) ) | The Honorable Margaret Ann Brennan, Judge, presiding. |
| Defendants | ) ) | |
| (Jameson Real Estate, LLC, Plaintiff-Appellee, v. Aqueel Ahmed, Defendant-Appellant). | ) ) ) ) ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1 In this appeal, defendant Aqueel Ahmed claims the trial court erred in entering judgment after a bench trial in favor of plaintiff Jameson Real Estate, LLC (Jameson), on plaintiff's *quantum meruit* claim that Ahmed failed to compensate Jameson for brokerage

services it provided to Ahmed in the purchase of certain real property. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3                               A. Complaint and Answer

¶ 4         Plaintiffs filed a complaint for real estate brokerage fees on October 8, 2014. After a motion to dismiss for failing to state a cause of action was granted, plaintiffs filed an amended complaint on April 21, 2015. The amended complaint contained five counts: (I) breach of agreement, (II) breach of verbal agreement, (III) unjust enrichment, (IV) *quantum meruit*, and (V) fraud. The only count at issue on this appeal is plaintiff's *quantum meruit* claim against defendant Ahmed.

¶ 5         In this count, plaintiff alleges that it is a real estate brokerage firm that employs plaintiff Art Collazo, who submitted an offer to purchase White Glove Car Wash (car wash) from Yoder, Inc., with an option to purchase the underlying real property from Terraco, Inc. (Terraco). After negotiating with Terraco for several months, Collazo was introduced to defendant Ahmed, owner of defendant Euro Collision, Inc. (Euro Collision), as a potential partner for purchasing both the business and real property. Before being introduced to Collazo, Ahmed was not aware that the business or real property was for sale. On October 31, 2012, Collazo and Ahmed signed a Confidentiality and Non-Disclosure Agreement (confidentiality agreement). After this agreement was executed, Collazo provided Ahmed with information about the business and property. Ahmed told Collazo he was interested in purchasing the business and property on behalf of his company, Euro Collision, Inc. In February 2013, Collazo told Ahmed that he would release his rights to the partnership established in the confidentiality agreement, if Ahmed or his corporation, Euro Collision,

2

paid plaintiff Jameson, Collazo's employer, a 5% commission as their broker when purchasing the business and property. Ahmed orally agreed. Ahmed purchased the real property and car wash on behalf of Euro Collision,[1] based on the information provided to Ahmed by Collazo and for which Jameson was not compensated. Plaintiff Jameson alleged that the reasonable value of its services to defendants was $115,000.[2]

¶ 6    Defendants Euro Collision and Ahmed each filed an answer, denying all the allegations contained in count IV of plaintiffs' amended complaint.

¶ 7    B. Trial

¶ 8    The matter proceeded to trial on May 22, 2017. Plaintiff Collazo and defendant Ahmed each testified on their own behalf, and Robert Swanson, an employee of Terraco, testified on plaintiffs' behalf. Plaintiffs voluntarily dismissed defendant Euro Collison, Inc., from the suit prior to trial since the corporation never took title to the business or real property.

¶ 9    1. Art Collazo

¶ 10    Art Collazo testified that he has been a licensed real estate broker in Illinois for 23 years, was Vice President of Sales for Jameson, and is authorized to enter into contracts on the company's behalf. Collazo specializes in off-market commercial properties. Collazo explained that a property is off-market when it is not publicly listed. To broker the sale of off-market real estate, Collazo "pound[s] the pavement" to locate properties, finds purchasers

---

[1]Ahmed testified that he purchased the real property in his individual capacity for $2.34 million as part of a $2.479 million transaction that included the assets of the car wash business in addition to the property itself. Defendant Ahmed stipulated at trial that SS 2130, an LLC owned by Ahmed, took title to the property.

[2]Collazo testified that he negotiated for Ahmed to purchase the real property for $2.3 million; $115,000 is 5% of $2.3 million. Collazo did not testify to the price he negotiated for the car wash business.

for those properties, and then negotiates "sales price, terms,*** anything that get[s] the deal down the path and gets both sides talking and mutually agree." According to Collazo, he is known as "one of the top guys in the city to find off market property."

¶ 11    When Collazo represents a purchaser on an off-market property, it is usual and customary for the purchaser to pay his brokerage commission. An average brokerage commission is 10% for a business and 6% for real property. The rate of commission can vary based on how many people are involved, the fees, and the structure of the agreement. When Collazo is himself planning to be a partner in a transaction, his compensation depends on his role in the transaction and his capital contribution. This commission is paid at the closing of the transaction in either the disbursements of the closing proceeds or a separate payment. The commission is paid to Jameson, not to Collazo in his individual capacity.

¶ 12    While it is typical for Collazo to have a written agreement regarding the brokerage commission, he does some work without a written agreement and performs brokerage services before the agreement is signed in many instances. When he presents an opportunity to a client, he asks them to sign a confidentiality agreement before he provides them information about the property.

¶ 13    Collazo testified that, in addition to his work as a broker with Jameson, he purchases businesses and real property in an individual capacity. Collazo purchases a business only if he can own or control the real property component and the real property component is valuable even if the business fails, so he has an "exit plan." He has owned several businesses, including a development company, a contracting company to build for his development company, and two food establishments. He has developed over 60 buildings in Chicago, and

his development company has also developed buildings for other developers. He does not currently own any businesses.

¶ 14    Collazo was a customer of the car wash for over 10 years and knew Harold Yoder, the owner of the car wash. Collazo repeatedly expressed to Yoder his desire to purchase the car wash. Collazo believed purchasing the car wash would diversify his real estate portfolio and provide a steady stream of income. In 2011 or 2012, Collazo initiated talks with Yoder about the sale of the car wash. At Collazo's request, Yoder provided him with the financial information about the property. Collazo learned that the real property on which the car wash business was located was owned by Terraco, a development company. Collazo informed Scott Gendell, the president of Terraco, of his interest in purchasing the property. Collazo negotiated directly with Robert Swanson, Terraco's chief financial officer, while his attorneys modified the terms of the purchase option agreement that was never executed.

¶ 15    The draft of the proposed purchase agreement for the property admitted into evidence is dated April 1, 2012, and identifies the seller as White Glove Center, Limited Partnership, an entity controlled by Terraco, and the purchaser as WGC, LLC (WGC), an LLC that Collazo's attorney was then in the process of forming. The asking price was $2.65 million on the real estate. Collazo did not execute the purchase option with Terraco, because he had not completed his negotiations with Yoder for the purchase of the business itself. Collazo was "having a very difficult time deciphering" the profits and losses of the car wash and placed the negotiations with Terraco "on hold" until he could better understand the car wash business.

¶ 16    In the fall of 2012, Collazo asked Matt Katsaros, one of Jameson's "top commercial brokers," if Katsaros could recommend an individual who understood the car wash business.

Katsaros recommended defendant Ahmed as an individual with "a lot of money," who had previously owned and sold car washes. Ahmed had previously employed Jameson as his broker in the purchases of two listed properties under a written agreement, and the commissions for those purchases were paid from the seller's proceeds. Collazo decided to contact Ahmed about either partnering with Collazo to purchase the property or having Ahmed employ Collazo as a broker in purchasing the property. Katsaros contacted Ahmed to determine if he was interested. Ahmed agreed to meet Collazo, but before sharing information about the property, Collazo required Ahmed to sign a confidentiality agreement. Katsaros e-mailed this agreement to Ahmed. It was standard practice for Collazo to ask potential purchasers in off-market transactions to sign these agreements, which prevented the other party from "go[ing] behind" Collazo to purchase the property without compensating him and allowed Collazo to recover the information if the other party lost interest in the property, so he could quickly distribute it to another potential purchaser.

¶ 17     The "Confidentially and Non-Disclosure Agreement" was admitted into evidence and was signed by Collazo and Ahmed. The three parties to the agreement were Ahmed, Collazo, and WGC. The first page of the confidentiality agreement established that the parties were "exploring the possible transaction" and that the recipient was required to agree to the confidentiality requirements as "conditions precedent to receiving information concerning the company." He described the second paragraph as an "acknowledgment" of the work Collazo had already performed to acquire the information and initiate negotiations with the seller. The paragraph titled "Indemnification" states that the recipient is "not supposed to use the information to further [himself] on this or enrich [himself] on this transaction" and establishes certain liability expenses and penalties for doing so. The seventh section

establishes that if the recipient is "not going to move forward" with the deal, then he or she must return the information to Collazo.

¶ 18    The "Indemnification" paragraph of the agreement states that

"[t]he recipient will hold harmless the Company and its managers, members, assigns, agents, and affiliates (collectively the 'indemnitee') from any liabilities and expenses including but not limited to attorneys' and accountants' fees, investigation costs, travel costs, transcript costs, disbursements, settlement amounts, judgment, fines or penalties, which any Indemnitees incur in connection with any claims, actions, suits, or proceedings, (whether civil, criminal, administrative, or investigative, including all associated appeals) in which it is determined by a court of competent jurisdiction that Recipient breach its confidentiality and obligations set forth in this Agreement."

¶ 19    The seventh paragraph, titled "Return of Data- No Use," states that

"[i]f the Recipient does not enter into any transaction with the Company, upon request of the Company, the Recipient immediately will return to the company, or in the event that any materials contain the Recipient's analysis of the Confidential Information the Company may elect to destroy all the Confidential Information and all notes, data, plans, reference material, software, memoranda, programs, documents, records, copies of any of the foregoing and all other information which in any way relates to the Confidential Information. The Recipient will not retain any copies or abstracts of the foregoing items in any media and acknowledges that this Agreement does not grant the Recipient any use of or other rights in the Confidential Information, the Recipient's sole right being to review the Confidential Information for consideration of entering into a transaction with the Company."

¶ 20　　　　Ahmed signed the confidentiality agreement on October 31, 2012. After Katsaros returned the signed agreement to Collazo by e-mail, Collazo shared with Ahmed the financial documents he had obtained from Yoder, including the profits and losses of the business and the terms of its lease with Terraco. Ahmed and Collazo met to determine the right price to offer for the business and the real property. Together, they were able to negotiate a lower price for the business, but there is no evidence what that price was. Collazo negotiated down the price of the real property from $2.65 million to $2.3 million. During these negotiations, Collazo and Ahmed did not discuss whether they would be partners in the purchase or if Collazo would be paid a broker's commission. Nothing in the confidentiality agreement discussed the payment of any broker's commission.

¶ 21　　　　On January 8, 2013, Collazo exchanged e-mails with Robert Swanson, the chief financial officer of Terraco. The e-mails were admitted into evidence. Collazo shared with Swanson an e-mail in which Ahmed stated he was interested in purchasing the car wash business. Swanson responded by e-mailing the terms of the lease, including its "monthly minimum rent" of $18,994, and that he was willing to meet with Ahmed if Ahmed agreed to the terms of the lease. Collazo and Ahmed then met with Swanson and other representatives of Terraco at Terraco's offices. On January 16, 2013, Ahmed sent Collazo an e-mail that was admitted into evidence and included Ahmed's potential business plan to share with Terraco. Collazo sent Ahmed's business plan without modification to Swanson on January 17, 2013, by e-mail, which was also admitted into evidence. After Terraco received this plan, negotiations continued. Collazo desired to make Terraco comfortable with potential partners and was still "trying to get to some final number."

¶ 22    In January 2013, personal matters began affecting Collazo's involvement in the negotiations. He decided that the car wash was "not such a great deal," and that, instead of being a partner in the purchase, he would pursue a broker's commission and move on. Collazo told Ahmed that he did not want to pursue a partnership with Ahmed to purchase the property and instead would accept a brokerage fee. After this conversation, Collazo still continued to assist with the transaction. In late January 2013, communication briefly ceased between Collazo and Ahmed, as Ahmed dealt with a personal matter. On February 1, 2012, Collazo texted Ahmed to ask if he was still interested in purchasing the property, Ahmed confirmed that he was still interested, and they continued to communicate about the property. Collazo and Ahmed's communications via text message from December 12, 2012 to March 5, 2013 were admitted into evidence. On February 5, 2013, Collazo and Ahmed met with Yoder and Swanson at the car wash.

¶ 23    On the following day, February 6, 2013, Collazo met with Ahmed and handed him a hard copy of a brokerage services agreement admitted into evidence. It listed the parties as Jameson and Ahmed and stated that Ahmed would pay Jameson a 5% brokerage commission on the price of the business and the real property involved in the transaction at the time of closing. A 5% commission on $2.3 million purchase price Collazo negotiated for the property would be over $100,000.[3] Following the meeting, Collazo e-mailed a copy of the agreement to Ahmed. He signed this e-mail, "Art Collazo, Vice President of Jameson Subsidies International Realty." In a text message, Collazo asked Ahmed to sign and fax him a copy of the agreement. That evening, Ahmed sent Collazo a text back stating: "I will take care of it first thing in the morning. No worries." Collazo texted Ahmed, "Thank you."

---

[3]Though Collazo did not testify to the exact figure, a 5% commission on a $2.3 million purchase is $115,000, the amount sought by the plaintiffs in their complaint.

Ahmed responded, "No problem!" This was the last text message Collazo received about the brokerage agreement. Collazo understood the exchange to mean that Ahmed accepted the terms of the brokerage agreement. In Collazo's experience, if "somebody doesn't discuss or send me something, it's understood [they are] fine with it unless [they are] going to negotiate it." While typically, Collazo would not act as a broker for a client without a signed brokerage agreement, he decided to continue to act as a broker without a signed agreement in this transaction because he had already performed the work of "negotiating and bringing [Ahmed] into the deal" and was entitled under the confidentiality agreement to find a new client to purchase the property if Ahmed decided not to purchase the property. At a later meeting, Ahmed offered to pay a fee to Collazo individually as an alternative form of compensation to signing the brokerage agreement with Jameson. Collazo refused the offer.

¶ 24        After February 6, 2013, Collazo continued to be involved in "communicating, negotiating, [and] helping" Ahmed with the transaction. At no point in February 2013 did Ahmed ask Collazo to stop working on his behalf. Collazo remained in communication with Ahmed, Yoder, and Swanson. On February 13, 2013, Collazo texted Ahmed to discuss his negotiations with Yoder. On February 27, 2013, Collazo received an e-mail from Ahmed, which included the draft of a letter Ahmed was writing to Swanson to negotiate a lower price for the property. Collazo responded with revisions he made to Ahmed's letter to make it more likely to persuade Terraco to lower its price. This exchange was admitted into evidence. A short time later, Collazo met with Ahmed, who informed him that he no longer planned to purchase the property. After this meeting, Collazo attempted to contact Ahmed several times, and Ahmed did not respond. Collazo gave Ahmed a two-week opportunity to revisit the deal, then Collazo attempted to contact Terraco on behalf of another potential purchaser for the

property. After a delay Collazo thought uncharacteristic of his prior dealings with Terraco, a Terraco representative informed Collazo by e-mail that the potential purchaser should contact Terraco directly. When the potential purchaser did so, Terraco responded that the property was already under contract. Neither of these e-mails were admitted into evidence.

¶ 25 Collazo testified that he first learned the property was under contract in a conversation with employees at the car wash in the spring of 2013. In August 2013, he received an e-mail from Terraco, not admitted into evidence, confirming that the property was under a contract of sale to Ahmed. Since Ahmed's purchase of the property, Collazo has observed significant renovations to the car wash, including the addition of a second floor to the structure. Ahmed neither paid Jameson a brokerage fee nor returned the confidential information about the business to Collazo.

¶ 26 2. Robert Swanson

¶ 27 Robert Swanson testified that he has been involved in commercial real estate for 48 years and had been employed by Terraco for 30 years, working in property management, sales, leasing, and as executive Vice President from 2011 to 2013. In this capacity as executive Vice President, he oversaw Terraco's brokerage services, but did not testify as to whether he was a licensed broker. Swanson is currently semi-retired, but remains involved in "property management and other brokerage situations." Scott Gendell was the president of Terraco and also the managing partner of White Glove Center Limited Partnership (White Glove Partnership), an entity controlled by Terraco that actually owned the subject property. After White Glove Partnership purchased the property in 2003 or 2004, Terraco managed the property and was authorized to enter into contracts on the Partnership's behalf. Terraco

leased the property for a car wash business to Harold Yoder. By 2012, the business was in financial distress.

¶ 28 Swanson knew Collazo from the brokerage community and was aware that Collazo was employed by Jameson, a development company he had done business with in the past. Terraco initially retained Collazo to publicly list the property,[4] but began negotiating with Collazo as he "tried to buy it as an individual or [as part of] a group." Swanson was not aware that Collazo had not listed the property. No listing agreement or other document referring to a listing agreement between Collazo and Terraco was admitted into evidence. The beginning stages of his negotiations with Collazo dealt with the price term and how Collazo would finance the purchase. Collazo agreed to a one-year option contract to purchase the property, but did not execute the written option.

¶ 29 Collazo introduced Swanson to Ahmed in Terraco's offices. Swanson, Collazo, Gendell, and Ahmed discussed Ahmed purchasing the assets of the car wash and maintaining the existing lease. Prior to Ahmed's introduction by Collazo, Swanson had not communicated with Ahmed concerning the property. Swanson sent Collazo an e-mail, admitted into evidence, on January 8, 2013, discussing the terms of the car wash lease. On January 17, 2013, Swanson received an e-mail from Collazo containing Ahmed's business plan for the car wash.

¶ 30 In February 2013, Swanson exchanged a series of e-mails with Ahmed and Gendell concerning the property that were admitted into evidence. Ahmed sent an e-mail to Gendell on February 13, 2013, discussing a sale of the real property. Gendell replied on February 14, 2013, stating that he had spoken to Ahmed on the phone and they had agreed to an 18-month

---

[4]Collazo did not testify to the existence of any listing agreement with Terraco. The trial court made no mention of a listing agreement between Collazo and Terraco in its findings.

leasing agreement with an option to purchase and that when Ahmed purchased the car wash from Yoder, Terraco would receive $100,000 for past due rent owed by Yoder. In his response to Gendell, Swanson stated: "I assume there was no mention of any fees that may be due Art Collazo." Swanson testified that since the listing agreement by Terraco with plaintiff had expired, Terraco would owe no fees to Collazo on the transaction.

¶ 31     Swanson sent an e-mail to Gendell on February 16, 2013, which was admitted into evidence, referencing a "lengthy conversation" between Swanson and Collazo and stating that Collazo had asked if Terraco would negotiate with Ahmed about selling the car wash equipment if Terraco acquired the assets of the car wash. Swanson stated in the e-mail that he assured Collazo that Terraco was moving forward to "finish a deal" with Ahmed. On February 19, 2013, Ahmed faxed Swanson a written offer, which was admitted into evidence, to purchase the real estate for $2.3 million. This terms of the offer included a provision that Ahmed would pay $100,000 in past due rent owed by Yoder, but did not mention the assets of the car wash.

¶ 32     When Yoder filed for bankruptcy protection, Terraco obtained the assets of the car wash and thus could transfer the car wash's equipment to Ahmed with the real property. Swanson did not recall whether there was a period between February and March 2013 in which Ahmed abandoned his interest in the property. While Swanson did not recall contacting Ahmed to resurrect the deal, he testified that once Terraco possessed the car wash's assets, he would have likely contacted a potential purchaser for the property. On March 21, 2013, Swanson sent an e-mail to Ahmed, stating that Swanson and Gendell had received Ahmed's letter of intent and agreed to a purchase price of $2.34 million for the real property and the assets of the car wash, plus an additional $100,000 to cover Yoder's

13

arrearage. These terms differed from those proposed earlier by Collazo because they allowed Ahmed to acquire both the real property and the car wash's assets in a single transaction with Terraco, rather than purchasing the real estate from Terraco and acquiring the car wash's assets in a separate transaction to purchase the car wash business from Yoder.

¶ 33 On April 25, 2013, Ahmed contracted to purchase the real property and former assets of the car wash for $2.34 million and $100,000 in past due rent. The "Purchase and Sale Agreement" identified "White Glove Center Limited Partnership" as the seller and "Aqueel Ahmed or his assignee" as the purchaser of the property. Swanson signed the agreement on behalf of White Glove Partnership, and Ahmed signed in his individual capacity. The premises purchased consisted of the land, improvements including the building, and personal property used in connection to those improvements. Between the signing of the purchase agreement and the closing of the purchase on September 30, 2013, there were several meetings at the property to perform certain work and eliminate potential hazards. The final price in the purchase agreement was $2.479 million.

¶ 34 The Escrow Trust Disbursement Statement prepared by Chicago Title and Trust Company for the transaction, listed a $50,000 brokerage commission paid to Terraco from the seller's proceeds. Swanson testified that it was common practice for Terraco to pay itself a brokerage commission on the sale of a property it managed, that $50,000 was a fair commission for the sale of the property, and that a purchaser's broker would have received a commission of approximately the same amount. The statement listed no brokerage fee paid to plaintiff.

¶ 35    After Swanson's testimony, plaintiffs stipulated to the existence of an entity identified as SS 2130, LLC, which took title to the real property on September 30, 2013, and that Ahmed is the sole member of SS 2130, LLC.

¶ 36    Plaintiffs then rested, and defendant filed a motion for a direct finding on each count. The trial court directed three counts in favor of defendant for insufficient evidence: (I) the breach of agreement, (II) the breach of oral agreement, and (V) fraud. The trial court found sufficient evidence for the (III) unjust enrichment and (IV) *quantum meruit* claims to move forward because of the evidence presented that Collazo was the procuring cause by which Ahmed became aware of the property.

¶ 37                            3. Aqueel Ahmed

¶ 38    Aqueel Ahmed testified that he starts and manages automotive-related businesses, including multiple car washes, collision shops, and a mechanical business. Ahmed had employed Katsaros in his capacity as a Jameson broker on two prior purchases. In the first purchase, Katsaros, on behalf of plaintiff, had been the listing agent for the seller, and Ahmed signed a dual agreement allowing plaintiff to receive the entire commission. In the second purchase, Ahmed employed Katsaros, on behalf of plaintiff, as one of multiple brokers in the transaction. In both of these transactions, the broker's commission was paid through the seller's proceeds.

¶ 39    Ahmed testified that Katsaros facilitated the introduction of Ahmed to Collazo in late 2012. Collazo called Ahmed and asked Ahmed for a meeting to sign a confidentiality agreement. Collazo told Ahmed that he had to sign the confidentiality agreement before Collazo shared any information.

¶ 40         Ahmed met with Collazo after he signed the agreement. Ahmed had not communicated with the owners of the business or the real property about purchasing the properties before receiving the confidentiality agreement from Collazo. After multiple conversations with Collazo, Ahmed began to explore the feasibility of purchasing both the business and the real property. From November 2012 through March 2013, Collazo assisted Ahmed in setting up meetings with the sellers of the business and real property. However, during this time, Collazo did not assist Ahmed in negotiating for the sale of the business and real property. Collazo was first attempting to purchase the property himself and came to Ahmed to "figure out how to look at the business." At Collazo's request, Ahmed composed a business plan for the car wash on January 16, 2013.

¶ 41         Ahmed observed that the car wash at the subject property was "not doing well at all" and "was on the brink of collapsing." Ahmed identified multiple sources for this particular car wash's problems, including (1) a lack of business, (2) a lack of ownership, (3) a failure to reinvest profits back into the business, and (4) an "extremely high" rent rate. Ahmed communicated to Collazo that purchasing the business could only be a profitable enterprise if the rent was lowered or the purchase included the real property on which the car wash was located.

¶ 42         Ahmed never agreed that Collazo would be his real estate broker. When Collazo handed Ahmed a proposed brokerage agreement on February 5, 2013, Ahmed orally rejected the agreement. Ahmed offered Collazo a cash payment, telling Collazo that in Ahmed's experience the brokerage commission was paid through the seller's proceeds, but that Ahmed did owe Collazo a "finder's fee." Ahmed did not agree to this fee being a 5% commission. On February 6, 2013, Collazo e-mailed the proposed brokerage agreement to Ahmed. At 7:20

16

p.m. on February 6, 2013, Collazo sent Ahmed a text message stating: "I sent over a commission agreement at 4:45 p.m. today, please sign or e-fax it back, thanks Art." Ahmed responded with a message stating: "I will take care of it first thing in the morning, no worries."

¶ 43 After February 6, 2013, Ahmed did not send any written communication rejecting Collazo's brokerage services, but Collazo continued to assist Ahmed. On February 13, Collazo discussed negotiations with Yoder in a text message to Ahmed. On February 27, Ahmed sent Collazo a text message, asking Collazo to call him upon receipt of an e-mail. Ahmed sent an e-mail to Collazo at 11:59 a.m. on February 27, 2013, sharing ideas, so Collazo could assist Ahmed in negotiations with Swanson for purchasing the property. At this time, Ahmed was negotiating the sale of the business and the real property separately. Ahmed was "still putting the numbers together" and sharing those numbers with Collazo. At 2:02 p.m. on February 27, 2013, Collazo responded to Ahmed's e-mail by editing the e-mail before it was sent to the owners of the property. Ahmed did not know Collazo's motives in assisting him at that time.

¶ 44 On March 5, 2013, Ahmed, Collazo, Swanson, and Gendell met at Terraco. At this meeting, Gendell told Collazo that Terraco would not pay Collazo a commission. After this meeting, Ahmed decided the asking prices for purchasing the business and real property separately was too high and articulated this conclusion to Collazo.

¶ 45 After informing Collazo he was no longer interested in purchasing the business or property, Ahmed received a phone call from a representative of Terraco, informing him that Terraco had obtained the car wash's assets and asking to resurrect the deal to purchase the real property. This proposed deal differed from the agreement negotiated by Collazo because

it would allow Ahmed to obtain the real property and assets of the car wash in a single transaction.

¶ 46        After this phone call, Ahmed submitted to Terraco a letter of intent to purchase the property a few days before March 21, 2013. No letter of intent matching this approximate date was admitted into evidence. Ahmed testified that the letter of intent admitted into evidence and dated February 19, 2013, was not faxed by Ahmed, despite his name appearing on the document as the sender and potential purchaser. Ahmed is unaware of who faxed the document to Swanson. Ahmed would have signed any letter of intent that he sent, and his signature is not on the document. Ahmed also testified that the letter of intent was misdated and that the phone call from Terraco is not mentioned in the letter because all of Ahmed's letters of intent are "pretty similar" and he only changes the addresses and "a few things here and there" before sending them to sellers.

¶ 47        On March 21, 2013, Swanson notified Ahmed by e-mail that Terraco had reviewed Ahmed's letter of intent and accepted the offered price for the property. In the e-mail, Swanson was referring to the March 2013 letter of intent, not the February 19, 2013 letter of intent admitted into evidence. In April 2013, Ahmed informed Collazo that Ahmed was moving forward with purchasing the property, but did not do so in writing. When entering into the transaction with Terraco, Ahmed did not tell Terraco he was working with Collazo. Terraco could only include a commission to Collazo and Jameson if Ahmed informed Terraco of Collazo's involvement.

¶ 48        On September 30, 2013, the sale of the property closed, and Ahmed's LLC took possession of the property. In the settlement statement for the closing of the property in evidence, Ahmed paid $2.34 million for the property. Ahmed was not certain whether a

18

brokerage fee to Collazo was reflected in that amount and believed it had to "do something with the seller." The "top price" for the property was $2.34 million, "whatever the commission agreements were, that's between Terraco and Art." Ahmed paid $119,000 in disbursements to the proceedings. He paid approximately $100,000 in back rent for the assets of the car wash.

¶ 49                                    4. Finding of the Trial Court

¶ 50        The trial court found that plaintiff was entitled to compensation under its *quantum meruit* claim because plaintiff did in fact perform brokerage services for the defendant.

¶ 51        The trial court found that Ahmed was initially brought into the deal by a Jameson broker, who introduced him to Collazo. When this introduction occurred, Collazo was deciding whether he would be "making his own business deal" to purchase the property or "eventually shift it over into brokerage." While not all services provided by Collazo to Ahmed were brokerage services, Ahmed would not have had the opportunity to connect with the sellers of the property without plaintiff's efforts.

¶ 52        The trial court found that the letter of intent was sent in the period of time in which the brokerage agreement would have been active if it had been executed. The trial court further found that it was reasonable to believe that Ahmed agreed to some aspects of the brokerage agreement and that he sent a letter of intent no later than March 21, 2013, because Swanson replied to the letter by e-mail.[5] The trial court found that Ahmed's testimony that the letter of intent was not his agreement was "not entirely credible."

---

[5]Swanson's e-mail is Plaintiffs' Exhibit 14. In this e-mail, sent at 10:32 a.m. on March 21, 2013, Swanson states, "I have reviewed you LOI with Scott" and proceeds to provide terms of an agreement to purchase the real property.

¶ 53    The trial court found that, in a commercial real estate transaction with a dual agency, there is often a rate set for the seller and another for the purchaser. The agreement between Terraco and its agents in selling the property was evidence of what a reasonable fee would have been for Jameson as the purchaser's broker.

¶ 54    The trial court entered judgment in favor of plaintiff Jameson and against defendant Ahmed individually in the amount of $50,000 on the *quantum meruit* claim only.

¶ 55    This appeal follows.

¶ 56                                    II. ANALYSIS

¶ 57    On appeal, defendant Ahmed argues that the court erred in entering judgment in favor of plaintiff Jameson and against defendant Ahmed on the *quantum meruit* claim because (1) there was no evidence at trial of the value of the brokerage services provided, (2) the beneficiary of brokerage services was not Ahmed, but non-party Terraco or non-party SS 2130, and (3) the broker acted in bad faith by pursuing an off-market sale, rather than publicly listing the property as directed by Terraco.

¶ 58                                A. Standard of Review

¶ 59    After a bench trial, the fact-finding of the trial court will not be disturbed unless it is against the manifest weight of the evidence. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51 (2009). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). "The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Wade v. Stewart Title*

20

*Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59. Under this standard, this court may not "reweigh the evidence presented or make an independent determination of the facts." *Board of Education of Community Consolidated High School District No. 230 v. Illinois Educational Labor Relations Board*, 165 Ill. App. 3d 41, 55 (1987).

¶ 60                                              B. *Quantum Meruit*

¶ 61            "*Quantum meruit,* which literally means 'as much as he deserves,' describes a cause of action seeking recovery for the reasonable value of services nongratuitously rendered, but where no contract exists to dictate payment." *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010). To recover under a *quantum meruit* theory, a plaintiff must prove that (1) it performed a service to the benefit of the defendant, (2) it did not perform the service gratuitously, (3) the defendant accepted this service, and (4) no written contract existed to prescribe payment for this service. *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 781 (2002). To recover, the service performed by the plaintiff must be "of some measurable benefit to the defendant." *Van C. Argiris & Co. v. FMC Corp.*, 144 Ill. App. 3d 750, 753 (1986). A *quantum meruit* claim can be distinguished from an unjust enrichment claim by its means of calculating damages. "In a *quantum meruit* action, the measure of recovery is the reasonable value of work and material provided, whereas in an unjust enrichment action, the inquiry focuses on the benefit received and retained as a result of the improvement provided." *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 9 (2004).

¶ 62            "A broker who is the procuring cause of a sale is entitled to a commission under the theory of *quantum meruit* where a party receives a benefit which is unjust for him to retain without paying for it." *Halpern v. Titan Commercial LLC*, 2016 IL App (1st) 152129, ¶ 22.

When a broker provides real estate brokerage services to a purchaser, the broker should not be deprived of commission merely because the purchaser completed the sale without the broker's direct involvement, when the broker introduced the parties of the sale and the purchaser "admittedly would have never known about the existence of the property" without the broker's efforts. *Halpern*, 2016 IL App (1st) 152129, ¶ 23. If the purchaser claims that the broker abandoned the deal, "the evidence must show not only a discontinuance of his efforts by the broker, it must show abandonment by the purchaser of all intention to buy the property." *Western Pride Builders, Inc. v. Zicha*, 23 Ill. App. 3d 770, 773 (1974).

¶ 63                    C. Evidence of the Value of Brokerage Service Provided

¶ 64          In a *quantum meruit* claim, the amount awarded to a plaintiff is "purely a factual issue." *Anderson v. Gewecke*, 36 Ill. App. 3d 170, 176 (1976). Recovery "is limited to the reasonable amount by which the trial court finds [the] defendant was unjustly enriched at the expense of the plaintiff." *Nardi & Co. v. Allabastro*, 20 Ill. App. 3d 323, 328 (1974). In cases concerning the failure to pay the commission of a real estate broker, damages may be calculated "based on a percentage of the sales price." *Romanek-Golub & Co. v. Anvan Hotel Corp.*, 168 Ill. App. 3d 1031, 1043 (1988). They may also be calculated by the trial court's determination of how much the defendant saved by eliminating the broker's fee from the transaction. *Anderson*, 36 Ill. App. 3d at 176-77. The plaintiff must provide a basis for assessing damages with a "fair degree of probability," but need not prove the exact amount of its loss. *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 130314, ¶ 30.

¶ 65          In the case at bar, there was sufficient evidence for the trial court's finding that $50,000 was the reasonable value of the services provided by plaintiff Jameson to defendant. Defendant argues that $50,000, 2.1376751% of the purchase price, is unsupported by the

evidence and "not intuitive" in the present case. However, as the trial court found, Terraco paid itself a $50,000 commission as the seller's broker in the transaction, and this was "evidence of a reasonable fee" owed Jameson considering the practices of the real estate industry. The $50,000 commission paid to Terraco was established by the testimony of both Swanson and Ahmed, and Swanson described $50,000 as a reasonable commission for the purchaser's broker in the transaction. This amount is slightly less than half the 5% commission asked for in the unexecuted brokerage agreement, and therefore consistent with splitting the commission between the purchaser's and seller's brokers. Ahmed further testified that, in one of his previous transactions in which Jameson served as broker for both purchaser and seller, Jameson received a 5% commission, a $76,250 fee on a $1.525 million sale. We cannot find it was against the manifest weight of the evidence for the trial court to rely upon this testimony in determining the value of plaintiff Jameson's brokerage services.

¶ 66 The issue in the present case is similar to the facts before this court in *Halpern*, 2016 IL App (1st) 152129, ¶ 24, where this court determined that the trial court did not err in awarding $50,000 (1.19% of the sale price) in damages to the broker in an off-market real estate transaction. The trial court based this determination on the testimony of expert witnesses that a reasonable broker's commission for the property at issue would be between 1% and 6% of the purchase price. *Halpern*, 2016 IL App (1st) 152129, ¶ 24. Defendant argues that this expert testimony distinguishes *Halpern* from the present case and that a plaintiff needs expert testimony to prove with reasonable certainty the amount it is owed in a *quantum meruit* claim in the absence of a written agreement between the parties. However, the range provided by expert testimony was not the only factor considered by the *Halpern* court in affirming the trial court's determination. *Halpern*, 2016 IL App (1st) 152129, ¶ 24.

The *Halpern* court also cited the testimony that the plaintiff had paid a $100,000 " 'finder's fee' to another real estate professional" in its analysis. *Halpern*, 2016 IL App (1st) 152129, ¶ 24. The *Halpern* court was thus clear that a trial court's determination of the reasonable value of services must be based on evidence, but it did not limit the types of evidence which could support such a determination.

¶ 67     The present case is clearly distinguishable from *Benford*, 2014 IL App (1st) 130314, ¶ 26, in which the court considered the amount of damages a landlord owed a tenant for personal property destroyed by water leakage. The court found the plaintiff could not recover damages for the personal property because she could only offer evidence of the replacement value of the property and the original cost of the items were not measures of the property's fair market value at the time it was destroyed. *Benford*, 2014 IL App (1st) 130314, ¶ 31. In the case at bar, unlike *Benford*, two witnesses testified to Terraco's brokerage fee in the transaction, which provided evidence of the value of brokerage services.

¶ 68                              D. Collazo's Dual Roles

¶ 69     Defendant also argues that Jameson improperly equated Collazo's side business venture with Collazo's brokerage work on Jameson's behalf and that Collazo's activities as a purchaser's broker were so limited in their scope as to not to justify the award for those services. A real-estate broker is entitled to a commission if it "is the procuring cause of a consummated transaction which he was employed to negotiate." *Pietka v. Chelco Corp.*, 107 Ill. App. 3d 544, 549 (1982). A broker is the procuring cause if it "brings together the parties who ultimately consummate the transaction [citation] or *** is instrumental in its consummation." *Pietka*, 107 Ill. App. 3d at 549. A trial court may determine that a broker is the procuring cause of a transaction based on the broker's role in negotiations or in

24

disseminating information which leads to the consummated transaction. *Pietka*, 107 Ill. App. 3d at 549.

¶ 70 In the case at bar, the trial court recognized that Collazo's actions concerning the property were not solely the performance of brokerage services and that Collazo's "shifting positions" were relevant in determining the amount Jameson would recover. However, the trial court's finding that Ahmed and Collazo's earlier communications about the property occurred before he decided whether he would be a broker or a partner in the purchase is not irreconcilable with the finding that Jameson was the procuring cause of Ahmed purchasing the property. The trial court found that Ahmed was introduced to Collazo by another Jameson broker, Katsaros, and that, before this introduction, Ahmed was unaware that the property was for sale. Without this introduction by a Jameson broker, Ahmed would not have received the information about the property from Collazo, since the property was never publicly listed.

¶ 71 Furthermore, the trial court's finding that Collazo did act as Ahmed's broker on the transaction, after Collazo's withdrawal from a role as a potential purchaser, is supported by the record. Collazo provided brokerage services to Ahmed after he presented Ahmed with the brokerage agreement on February 6, 2013. This brokerage agreement, though never executed, showed that Collazo was then acting in his capacity as a Jameson broker. Ahmed offered Collazo a personal "finder's fee" for the property, but Collazo refused and told Ahmed the fee must be paid to Jameson. For weeks, Collazo acted as Ahmed's broker, while Ahmed was aware that Collazo believed Jameson would receive a commission for his labor. A few days after Ahmed was provided with the brokerage agreement, Collazo forwarded a draft agreement from Collazo to Terraco. Weeks later, Ahmed sent Collazo a draft of a letter,

so Collazo could review it with the goal of negotiating a lower price term. Ahmed did not communicate with Collazo that Jameson would not be compensated, while he benefitted from Collazo's efforts as a Jameson agent.

¶ 72 In sum, the trial court's determination that the efforts by Jameson's agents, Katsaros and Collazo, merited an award equivalent to Terraco's commission as the seller's broker in the transaction was not against the manifest weight of the evidence and we therefore affirm the trial court's judgment on that issue.

¶ 73                         E. Beneficiary of Brokerage Services

¶ 74 Defendant Ahmed next argues that the trial court's judgment should be reversed because he was not the beneficiary of any brokerage services by Jameson. The ability to purchase property is a benefit in itself. *Halpern*, 2016 IL App (1st) 152129, ¶ 23. A plaintiff may have a valid *quantum meruit* claim against multiple defendants concerning the same transaction, and therefore, the finding of one beneficiary does not exclude the finding of others. *Much Shelist Freed Denenberg & Ament, P.C. v. Lison*, 297 Ill. App. 3d 375, 376 (1998). The determination of whether a defendant benefited from a plaintiff's brokerage services in a *quantum meruit* claim is a question of fact and therefore will only be disturbed by this court when against the manifest weight of the evidence. *Halpern*, 2016 IL App (1st) 152129, ¶ 17. As noted, a "decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252.

¶ 75 In the case at bar, defendant Ahmed argues that the trial court erred in finding him to have benefitted from plaintiffs' brokerage services. Plaintiff argues that this claim should not be considered by the court because it was raised for the first time on appeal and constitutes

unfair surprise. "It is well settled that issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal." *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 29. Since Ahmed failed to raise his claims before the trial court, his argument has been forfeited. *Martinez*, 2012 IL App (1st) 111478, ¶ 29. Under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), an appellate court "may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent." *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33. However, such an exception is not warranted here because Ahmed's argument also fails on its merits.

¶ 76        Defendant Ahmed provides two alternative beneficiaries to Jameson's brokerage services. First, defendant argues that "[i]f any entity was the beneficiary of any brokerage services rendered by Jameson, it was Terraco" because the consummated transaction, initiated by Terraco, was substantively different from the transaction being discussed at the end of Collazo's involvement and Collazo had initially been employed as Terraco's broker in the transaction. Defendant cites several facts to support this claim: (1) Swanson testified that Terraco had once employed Collazo as its broker to sell the property, (2) Terraco could only communicate with defendant to resurrect the deal, because Collazo had introduced defendant to Terraco, and (3) the final agreement was different from those discussed in previous negotiations by Collazo because it did not require a separate transaction to purchase the business.

¶ 77        However, none of these facts shows that the trial court's finding that defendant Ahmed was the beneficiary of Jameson's services was against the manifest weight of the evidence. Collazo acted as Ahmed's broker after informing Ahmed of the expectation a

commission would be paid to Jameson. Ahmed was a signatory to the purchasing agreement made possible by Collazo's efforts and his introduction to Collazo by another Jameson broker. In addition, Ahmed only learned of the existence of the property through Collazo. Furthermore, the trial court found that defendant's testimony concerning who resurrected the negotiations was not entirely credible, a decision we will not second-guess on appeal. *Wade*, 2017 IL App (1st) 161765, ¶ 59. Although normally real estate commissions are paid by the sellers, Collazo testified that off-market commissions are usually paid by the purchaser. While the commission had been paid out of the seller's proceeds in the previous transactions for which defendant employed Jameson, those purchases were not off-market properties.

¶ 78        There is no evidence that Collazo was simultaneously acting as a broker for both parties in this transaction. Swanson testified that the prior listing agreement with Collazo expired before Ahmed was introduced as a potential purchaser and did not testify that he considered Collazo to be Terraco's broker during negotiations with Ahmed. In his interactions with Terraco during this period, Collazo did not present himself as Swanson's broker and did not approach Swanson about a brokerage agreement. Gendell told Collazo that Terraco would not be paying plaintiff any commission on the sale of the property. Furthermore, though the commission fee was paid to itself, Terraco did pay a brokerage fee on the transaction to a party other than Collazo. Accordingly, we do not find Ahmed's claim that Terraco was the actual beneficiary to be persuasive.

¶ 79        Alternatively, defendant Ahmed argues that SS 2130, not Ahmed, benefitted from Jameson's services as purchaser of the property. The trial court found that Jameson was the procuring cause of the purchase of the property by defendant. The parties' stipulation that SS 2130, a separate legal entity owned by Ahmed, took title to the property is consistent with

this finding. The purchase agreement listed the purchaser of the property as "Ahmed or his assignee." Ahmed's ability to purchase and assign the property was a benefit of the brokerage services performed by Jameson on his behalf. Ahmed was a party to the unexecuted brokerage agreement. The purchase and sale agreement listed Ahmed as the purchaser, and he signed the agreement in his individual capacity. The fact that his company was listed on the title does not change the result that Ahmed personally obtained a benefit from Jameson's brokerage services.[6]

¶ 80    In sum, the trial court's determination that defendant was a beneficiary of Jameson's brokerage services was not against the manifest weight of the evidence, and we therefore affirm the trial court's judgment on that issue.

¶ 81                                    F. Bad Faith

¶ 82    Finally, defendant Ahmed argues that plaintiff Jameson is barred from recovering under a *quantum meruit* claim under the doctrine of "unclean hands" because Jameson's agent, Collazo, acted in bad faith by (1) failing to publicly list the property, while employed to do so by Terraco, in order to purchase the property himself and (2) failing to assert a claim to the brokerage fee in the period between his learning of the contract to sell the property and the closing of the sale.

---

[6]We note that, at oral argument, Ahmed's counsel suggested that SS 2130 was a necessary party and that any *quantum meruit* claim should have been directed against it, as opposed to against Ahmed. However, Ahmed never raised such an argument before the trial court, and his arguments in his appellate brief concerned only the claim that SS 2130 was the beneficiary of any brokerage services. It is well settled that "[p]oints not argued [in the appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). Additionally, "an issue not presented to or considered by the trial court cannot be raised for the first time on review." *Kravis v. Smith Marine, Inc.*, 60 Ill. 2d 141, 147 (1975). Accordingly, we do not consider the arguments raised for the first time at oral argument.

¶ 83        The doctrine of "unclean hands" precludes a party from taking advantage of its own wrong. *Long v. Kemper Life Insurance Co.*, 196 Ill. App. 3d 216, 218 (1990). It is an equitable doctrine that bars relief when the party seeking that relief is guilty of misconduct in connection with the subject matter of the litigation. *Thomson Learning, Inc. v. Olympia Properties, LLC*, 365 Ill. App. 3d 621, 634 (2006). The doctrine only applies when the party's misconduct rises to a level of fraud or bad faith. *Thomson*, 365 Ill. App. 3d at 634. The court must look to the intent of a party to determine whether it acted with "unclean hands." *Thomson*, 365 Ill. App. 3d at 634. The doctrine is only available when the misconduct was "toward the party against whom relief is sought and *** connected with the transaction at issue in the litigation." *Zahl v. Krupa*, 365 Ill. App. 3d 653, 658 (2006).

¶ 84        The doctrine of "unclean hands" is applied at the trial's court discretion and therefore cannot be disturbed on appeal absent a determination that the trial court abused its discretion. *Long*, 196 Ill. App. 3d at 219. "A trial court does not abuse its discretion unless, in view of all of the circumstances, its decision so exceeded the bounds of reason that no reasonable person would take the view adopted by the trial court." *In re Marriage of Demar*, 385 Ill. App. 3d 837, 852 (2008).

¶ 85        The doctrine of "unclean hands" is an affirmative defense. *Long*, 196 Ill. App. 3d at 218. "Ordinarily, affirmative defenses must be set forth in the answer or reply to a complaint." *Enterprise Recovery Systems, Inc. v. Salmeron*, 401 Ill. App. 3d 65, 76 (2010). An affirmative defense is "the defendant's burden to plead and prove" and is "forfeited if not raised in a timely fashion in the trial court." *Nationwide Advantage Mortgage Co. v. Ortiz*, 2012 IL App (1st) 112755, ¶ 24. As noted, this forfeiture may be overlooked by the appellate

court "in the interests of achieving a just result and maintaining a sound and uniform body of precedent." *Jackson*, 2012 IL 111928, ¶ 33.

¶ 86        Defendant Ahmed did not raise the affirmative defense of "unclean hands" in his answer to plaintiffs' complaint or at trial. He raised it for the first time in his appellate brief. Therefore, the affirmative defense was forfeited by Ahmed's failure to raise it before the trial court. *Enterprise*, 401 Ill. App. 3d at 76.

¶ 87        Furthermore, even if defendant Ahmed had raised his affirmative defense in a timely manner, the "unclean hands" doctrine would still not bar plaintiff Jameson from recovering on its *quantum meruit* claim. While Ahmed alleged that Collazo acted in bad faith by failing to publicly list the property, Ahmed failed to allege or prove that Collazo's act in bad faith was directed towards Ahmed himself. If Collazo had indeed failed to publicly list the property in order to purchase it in his individual capacity and maximize his realizable commission, then his bad faith was directed against non-party Terraco, not Ahmed, and Ahmed's defense of "unclean hands" would not be applicable. *Zahl*, 365 Ill. App. 3d at 664.

¶ 88        With respect to his second claim, Ahmed offers no case law to support his argument that a broker's assertion of its claim after the closing of the sale on the property, when it could have brought the claim during the period in which the property was under contract, constitutes an act of bad faith. Ahmed argues that by not asserting a broker's lien or any other claim during the contract period, Collazo denied Ahmed and Terraco the opportunity to decide between themselves whether a commission was owed to Collazo, who would pay that commission, and whether judicial intervention was warranted. However, plaintiffs derived no financial incentive from this delay, and Ahmed also did not contact Collazo during this period. Furthermore, a broker's lien may only be filed on a commercial party if there is a

written brokerage agreement and the property has already been conveyed to the buyer. 770 ILCS 15/10(a)(3), (e) (West 2010).

¶ 89        Thus, a determination by the trial court that the doctrine of "unclean hands" was inapplicable did not constitute an abuse of its discretion, and Ahmed's forfeiture of the affirmative defense does not inhibit the interests of achieving a just result. *Jackson*, 2012 IL 111928, ¶ 33.

¶ 90                                          III. CONCLUSION

¶ 91        In *Allabastro*, 20 Ill. App. 3d. at 327, Justice George Leighton wrote:

> "In the law, the expression 'quantum meruit' means literally 'as much as he deserves.'
> [Citation.] It is an expression that describes the extent of liability on a contract
> implied by law. [Citation.] This liability is predicated on the reasonable value
> of services performed. Thus, the basis for recovery quantum meruit is receipt by a
> defendant from a plaintiff of a benefit which it is unjust for him to retain without
> paying for it."

¶ 92        Here, the trial court had before it the testimony of the persons involved, and the exhibits not only reflected the relations between the parties, it showed their intentions. Collazo introduced the property to defendant and acted as his agent throughout the negotiations until defendant decided he would structure the deal in a different manner through the suggestions of the seller. Defendant did so without plaintiff's knowledge and permission. The evidence shows that defendant was willing to pay a commission directly to the broker, but the commission was less than what the broker requested. However, the recovery was limited to the reasonable amount by which the trial court found defendant was unjustly enriched at the expense of the plaintiff.

¶ 93       For the foregoing reasons, we affirm the trial court's finding for plaintiff Jameson against defendant Ahmed on the *quantum meruit* claim for $50,000.

¶ 94       Affirmed.