2022 IL App (1st) 192530-U

FOURTH DIVISION
March 31, 2022

Nos. 1-19-2530 & 1-20-0832 (cons.)

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| ANDRZEJ POZNIAK, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee and Cross-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | No. 17 L 001544 |
| ROGER E. DUBA, CHURCHILL CABINET COMPANY, | ) | |
| CHICAGO GAMING COMPANY, and UNKNOWN | ) | |
| OTHERS, | ) | Honorable |
| | ) | Margaret Ann Brennan, |
| Defendants-Appellants and Cross-Appellees. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Affirming the judgment of the circuit court of Cook County awarding *quantum meruit* damages on a terminated contract.

¶ 2     Plaintiff Andrzej "Andrew" Pozniak (Andrew), a licensed roofer, entered into a roof damage consulting agreement with defendants Roger E. Duba (Roger), Churchill Cabinet Company (Churchill Cabinet), and Chicago Gaming Company (Chicago Gaming).  After defendants terminated the agreement and failed to pay Andrew for his services, he filed a complaint in the circuit court of Cook County.  Following a bench trial, the circuit court awarded

damages in the amount of $89,265 plus costs to Andrew under a *quantum meruit* theory, based on the termination of the agreement. Defendants contend on appeal that the trial court erred as a matter of law by finding the roof damage consulting agreement to be valid and enforceable as Andrew allegedly (a) performed the work in his capacity as a public adjuster, in violation of the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 2016)); (b) engaged in the unauthorized practice of law; and/or (c) had "unclean hands." In his cross-appeal, Andrew primarily contends that the trial court improperly calculated his damages. As discussed herein, we affirm.

¶ 3                                     BACKGROUND

¶ 4                              *The Original Roofing Work*

¶ 5      Churchill Cabinet manufactures wood partitions, fixtures, and cabinets for video gaming machines. Chicago Gaming manufactures and distributes video gaming terminals, arcade machines, and pinball, foosball, and pool tables. Both companies operate in a commercial building located in the 4600 block of West 19th Street in Cicero, Illinois (the building). Roger and/or other members of the Duba family own and manage the companies and the building.

¶ 6      Defendants retained Vojtek Zaca (Vojtek) and his company BRZ Construction Group, Inc. (BRZ) to perform painting and roofing work at the building. The subcontractors hired by Vojtek/BRZ painted some or all of the roof with the incorrect paint, which caused a rubber membrane on the roof to deteriorate and the roof to leak. The building and its contents sustained damage.

¶ 7                          *The Agreement and Andrew's Services*

¶ 8      In addition to being a licensed roofer, Andrew is also a licensed public adjuster, *i.e.*, an insurance professional which a policyholder may hire to assist in the settlement of an insurance claim with his own insurer, known as a "first-party claim." Andrew owns and manages Lake

Shore Public Adjusters Group LLC (Lake Shore) and other companies. After learning of the roof damage from one of his employees at the time – Ewa Matys, Vojtek's former spouse – Andrew contacted Roger.

¶ 9    The parties subsequently entered into a roof damage consulting agreement dated April 3, 2015. Pursuant to the agreement, defendants retained Andrew to provide advice and consultation regarding the necessary repairs or replacement of the roof. Defendants agreed to pay Andrew 33% of all recovered amounts. Although a recital in the roof damage consulting agreement initially provided that "the Owners intend to pursue all remedies available to recover from others, including Owner's Insurance Company," the reference to "Owner's Insurance Company" was crossed out and a handwritten note was added: "No – not our insurance company. They were not at fault."

¶ 10    Roger did not want to file a direct claim against the insurance carrier for Churchill Cabinet or Chicago Gaming for the damage. A claim was instead filed against Travelers Insurance Company (Travelers), which provided liability insurance for BRZ, the company which was responsible for the inferior roof work at the building. In a letter to Travelers dated April 11, 2015, Roger provided Andrew's contact information and referred to him as "our roof consultant." Travelers assigned its claims specialist Dawn McKeever (McKeever) to this matter.

¶ 11    Andrew participated in multiple inspections of the roof. After an inspection of the roof with Eric Koretge (Koretge), a general contractor retained by McKeever, Travelers initially offered to pay $190,600, consisting of the actual cash value of $146,041.32, plus reimbursement for $44,558.67 in temporary repairs which had already been made. Andrew responded that he did not agree with the proposed scope of the work and that he noticed "many defects" in the insurer's estimate. Among other things, Travelers generally asserted that the proper measure of

damages was the depreciated value of the 17-year-old roof, whereas Andrew opined that the replacement of the roof was necessary. Andrew prepared his own roof replacement estimate of approximately $1.2 million in October 2015. When Andrew requested another inspection, Koretge brought a roofing contractor to the building.

¶ 12    On January 8, 2016, Travelers raised its offer to $416,500. At Andrew's direction, his employee Katarzyna "Kasia" Stadnik asked McKeever for support for Travelers' position that it did not owe the replacement cost value.

¶ 13    Roger subsequently sent Andrew a number of letters on Churchill Cabinet stationery. In a letter dated January 29, 2016, Roger claimed that Andrew's roofers (not Vojtek's) had "criminally destroyed" the roof. In a letter dated February 2, 2016, Roger terminated the roof damage consulting agreement. He claimed that Andrew had misrepresented his role, by presenting himself as a roofer and a consultant and not a public adjuster. Roger also asserted that Andrew repeatedly attempted to have Roger sign a letter to the insurance company falsely stating an inflated cost of roof repairs. Roger informed Andrew that neither he nor the other defendants own the building, asserting: "Since I have no interest in the building nor do the tenants, you cannot hold us liable." In a letter dated February 5, 2016, Roger accused Andrew of "fraudulent scheming" and opined that the 33% fee under their agreement was "excessive and absurd."

¶ 14    Roger then informed Travelers that the contract with Andrew had been terminated. Although Roger acknowledged the 33% fee in the roof damage consulting agreement, he claimed that he had left his glasses at home and could not read the agreement when it had been presented to him. Roger indicated that defendants' attorney had advised Roger that he would have to pay some amount for Andrew's work, but not the 33%.

¶ 15    Defendants accepted Travelers' offer, and a check for $461,058.67 ($416,500 +

$44,558.67 for temporary repairs) to Churchill Cabinet was deposited on March 16, 2016.

¶ 16                                    *The Complaint and Initial Proceedings*

¶ 17      Andrew filed a four-count complaint against defendants.  In count I (breach of contract), he alleged that defendants failed to perform under their agreement by refusing to pay him 33% of the recovered amounts.  In the alternative, Andrew asserted an unjust enrichment count (count II) and a *quantum meruit* count (count III).  In count IV, Andrew alleged that Roger fraudulently misrepresented his ownership of the building and his ability to bind Churchill Cabinet and Chicago Gaming to the roof damage consulting agreement.

¶ 18      Defendants filed a motion to dismiss the complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2016)), arguing that Andrew's claims were barred based on his knowing violations of the portions of the Illinois Insurance Code referred to as the Public Adjusters Law (215 ILCS 5/1501 *et seq.* (West 2016)).  Defendants contended, in part, that Andrew – as a public adjuster – was required to present a written contract to defendants in conformance with section 1575 of the Public Adjusters Law (215 ILCS 5/1575 (West 2016)), which he failed to do.  Defendants further asserted that Andrew preyed on Roger, who was described as an "uninformed person of advanced age."  According to defendants, the parties' agreement violated public policy and was manifestly injurious to the public welfare. Defendants sought dismissal of the complaint, which they asserted was based on a void contract.

¶ 19      Andrew responded that the authority cited by defendants was inapplicable, as the Public Adjusters Law governs public adjusters that adjust claims for loss or damage of "first party claims arising under insurance contracts that insure the real or personal property of the insured" (215 ILCS 5/1510 (West 2016)).  According to Andrew, the parties' contract involved a third-party liability insurance claim – *i.e.*, a claim against Travelers, not against defendants' own

insurer – which does not fall under the regulatory scheme of the Public Adjusters Law. Andrew argued that the power to invalidate an agreement on the basis of public policy is used sparingly, as the freedom to contract should not be needlessly hampered. He further contended that, even if the breach of contract count were dismissed, he should be able to recover under the other counts. The circuit court denied the motion to dismiss, finding that it was reasonable to infer that Andrew was not acting as a public adjuster with respect to defendants' third-party claims against BRZ's liability insurance company.

¶ 20    Defendants answered the complaint and ultimately filed affirmative defenses and an amended counterclaim. In their affirmative defenses, defendants alleged: (a) the parties' contract was legally void as against public policy; (b) a non-party, Lake Shore, and not Andrew, performed all of the services alleged in the complaint; (c) Roger terminated the contract in writing in early 2016 because the estimate by Lake Shore substantially exceeded other repair estimates and constituted insurance fraud; and (d) Andrew's claims for equitable relief were barred by his "unclean hands," *e.g.*, Andrew allegedly arranged for an individual to visit Roger and to effectively extort him based on supposed environmental and other violations at the building. Defendants asserted an amended counterclaim under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2018)).

¶ 21    Defendants then filed a motion for summary judgment pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2018)). First, they argued that the roof damage consulting agreement violated public policy and should be found void as a matter of law. Second, defendants contended that the termination of the agreement barred contract remedies. Third, they claimed that a *quantum meruit* remedy was barred by Andrew's course of misconduct.

¶ 22    During his deposition, Andrew testified, in part, that he met with Roger in his capacity as

a public adjuster and tried to convince Roger to pursue his own insurance company. When Roger specifically did not want to do that, Andrew contacted his attorney for a solution. Andrew's attorney told him that he could serve as a roofing consultant.

¶ 23     During his deposition, Roger testified that his children, Douglas Duba (Douglas) and Diane Duba, owned Churchill Cabinet and the building; Roger thought that Douglas and Douglas's wife Kathy were the owners of Chicago Gaming. Roger admitted that he signed the contract with Andrew as the owner of Churchill Cabinet and Chicago Gaming, although he claimed that the percentage line (where 33% was handwritten) was blank on the contract when he signed it. Roger believed that Andrew and Vojtek were jointly involved in this "total scam."

¶ 24     After briefing and arguments, the circuit court denied the motion for summary judgment, finding that there were genuine issues of material fact as stated on the record. The record on appeal does not include any transcript or other memorialization of the summary judgment proceedings.

¶ 25     Prior to trial, the circuit court entered an order addressing defendants' motion for summary determination of certain legal issues. The circuit court found, in part, that the February 2016 letter constituted effective termination but did not remove defendants' obligations for the performance rendered prior to the termination.

¶ 26                                    *The Trial*

¶ 27     A bystander's report of the bench trial is included in the record on appeal. The witnesses were: (1) Dawn McKeever from Travelers; (2) Andrew's attorney Richard Seligman; (3) Roger; (4) Roger's son Douglas; (5) Andrew; (6) Eric Koretge, the general contractor retained by Travelers; (7) Kasia Stadnik; and (8) Ewa Matys. The trial testimony included the following:

¶ 28     McKeever testified that she was not surprised by the $1.2 million roof replacement

7

estimate from Andrew but "obviously there needed to be additional investigation done." She indicated that an estimate of more than a million dollars was not unusual. McKeever confirmed that Andrew and Kasia emailed her regarding this matter using their Lake Shore email account, although she understood that Andrew was defendants' roof consultant. Andrew testified that he had referred to himself as a public adjuster in a communication with McKeever, and he characterized the use of the Lake Shore email account as a "small mistake done by my small office." He testified that his staff contacted Travelers only at his direction.

¶ 29    Andrew's attorney Richard Seligman testified that he had drafted the roof damage consulting agreement; he characterized it as a "third-party contract." He indicated that he has seen public adjuster contingency fees as high as 50%.

¶ 30    Roger testified that he believed Andrew was involved in the damage to the roof. Roger acknowledged that he signed the agreement with Andrew on behalf of Churchill Cabinet and Chicago Gaming even though he was not authorized to do so. Roger's son Douglas testified that defendants did not own the building and that Andrew "should have performed due diligence to see who really owned the property before signing the agreement."

¶ 31    Koretge testified that he thought Andrew's $1.2 million estimate was too high; Koretge's written estimate of the total replacement value after the re-inspection was approximately $850,000. He did not think that Andrew's estimate was fraudulent and offered that it was "expected that the claimant or contractor will have a higher number than the carrier's estimate." Koretge characterized Andrew as skilled and knowledgeable regarding commercial roofs.

¶ 32    Kasia testified that she had only met Ewa's ex-husband Vojtek on one occasion. Ewa testified that after Vojtek told her about the roof damage, she relayed this information to Andrew. She also testified that Kasia had dated a BRZ construction worker.

¶ 33    At the close of the case, the trial court found McKeever, Roger, and Douglas to be "not credible." The circuit court found Andrew to be "generally credible." The trial judge stated, "It is my belief that the [Dubas] intended not to pay [Andrew] from the very beginning when the contract was executed."

¶ 34    In a written order entered on July 31, 2019, the circuit court entered a judgment in favor of Andrew in the amount of $89,265 plus costs on count III (*quantum meruit*), based on contract termination. This amount represented 33% of the difference between the initial offer and the final offer from Travelers. The circuit court ruled in favor of defendants on count IV (fraudulent misrepresentation) and in favor of Andrew on defendants' amended counterclaim (Consumer Fraud Act). After their posttrial motion was denied, defendants filed an appeal and Andrew filed a cross-appeal (appeal number 1-19-2530).

¶ 35    As the order entered on July 31, 2019, did not expressly rule on certain counts, defendants subsequently filed a motion for entry of judgment. On June 23, 2020, the circuit court entered a judgment in favor of defendants on count I (breach of contract), count II (unjust enrichment), and count IV (fraudulent misrepresentation). Judgment was entered in favor of Andrew on the amended counterclaim (Consumer Fraud Act). The order stated that the judgment entered on July 31, 2019, in favor of Andrew on count III (*quantum meruit*) – in the amount of $89,256[1] plus costs – stands. Defendants appealed and Andrew cross-appealed the 2020 order (appeal number 1-20-0832). On defendants' motion, the appeals were consolidated.

¶ 36                              ANALYSIS

¶ 37    Defendants contend on appeal that the circuit court erred as a matter of law by finding the parties' agreement to be valid and enforceable, as the agreement "directly contravenes Illinois

_____

[1] This amount appears to be incorrect, as prior orders referenced "$89,265."

9

public policy and is therefore void." Defendants initially argue that the Illinois Insurance Code does not permit public adjusters to adjust third-party insurance claims. They also assert that Andrew engaged in the unauthorized practice of law. Finally, defendants claim that Andrew's "unclean hands" prevent him from obtaining an equitable award. For the reasons set forth below, we reject these contentions.

¶ 38                                    *Standard of Review*

¶ 39     After a bench trial, the fact finding of the trial court will not be disturbed unless it is against the manifest weight of the evidence. *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 59. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). This standard affords great deference to the trial court as the trial court is in a superior position to determine and weigh the credibility of the witnesses, to observe their demeanor, and to resolve conflicts in their testimony. *Jameson Real Estate*, 2018 IL App (1st) 171534, ¶ 59. "When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). Under the manifest weight standard, the reviewing court may not reweigh the evidence or make an independent determination of the facts. *Jameson Real Estate*, 2018 IL App (1st) 171534, ¶ 59.

¶ 40     We note, however, that a *de novo* standard of review applies to our review of the trial court's conclusions of law. *E.g.*, *Eychaner*, 202 Ill. 2d at 252 (stating that a trial court's ruling on the legal effect of documents is reviewed *de novo*); *In re Marriage of Hundley*, 2019 IL App

(4th) 180380, ¶ 48 (providing that the trial court's interpretation of a statute is reviewed *de novo*). The question of whether a contract is enforceable under the public policy of the state is a conclusion of law and turns on the particular facts and circumstances of each case. *Kim v. Citigroup, Inc.*, 368 Ill. App. 3d 298, 307 (2006). Accord *Rome v. Upton*, 271 Ill. App. 3d 517, 520 (1995).

¶ 41                            *Contracts – Void as Against Public Policy*

¶ 42    As a general rule, courts will not enforce a private agreement that is contrary to public policy. *Id*. at 519. See also *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 442 (2010) (noting that a statute that exists for the protection of the public cannot be rewritten through a private limiting agreement). "Public policy is the legal principle that no one may lawfully do that which has a tendency to injure the welfare of the public." *Kim*, 368 Ill. App. 3d at 307. The public policy of this State is reflected in its constitution, its statutes, and its judicial decisions. *Rome*, 271 Ill. App. 3d at 520.

¶ 43     Illinois courts apply a strict test when determining whether a contract violates public policy. *Kim*, 368 Ill. App. 3d at 307. "A court will not declare a contract illegal unless it expressly contravenes the law or a known public policy of this State, as public policy itself strongly favors freedom to contract." *Rome*, 271 Ill. App. 3d at 520.

¶ 44    Defendants contend that the Public Adjusters Law (215 ILCS 5/1501 *et seq.* (West 2016)) – which specifies the duties of and restrictions on public adjusters (see 215 ILCS 5/1505 (West 2016)) – precluded the roof damage consulting agreement at issue herein. According to defendants, the Public Adjusters Law "unambiguously limits a public adjuster to adjusting first-party insurance claims, and thus a public adjuster is prohibited from adjusting a third-party claim." Simply put, we reject this contention. The fact that the Public Adjusters Law addresses

conduct regarding first-party claims does not necessarily mean that the law prohibits a public adjuster from any involvement with a third-party claim, particularly where, as here, the public adjuster may be performing services in another capacity, *e.g.*, providing consultation services as a licensed roofer. As noted above, "[b]ecause public policy itself strongly favors freedom to contract, a court will not declare a contract illegal unless it expressly contravenes the law or a known public policy of this state." *Kim*, 368 Ill. App. 3d at 307. Unlike in certain cases cited by defendants, there is no express contravention of Illinois law or public policy in this instance. *E.g.*, *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 359-60 (1997) (declaring contract void where courts had strongly condemned the use of contingent fee contracts for witness finders); *Rome*, 271 Ill. App. 3d at 520 (invalidating contract for "shepherding" favorable legislation with a contingent fee due upon its passage).

¶ 45    The power to declare a private contract void as contrary to public policy "will be used sparingly." *First National Bank of Springfield*, 179 Ill. 2d at 359. In the instant case, we are unaware of any law or public policy of our state which would compel the invalidation of the parties' agreement herein.

¶ 46                    *Unauthorized Practice of Law*

¶ 47    Defendants next contend that the parties' agreement is void and unenforceable as it necessarily required Andrew to engage in the unauthorized practice of law. Andrew responds, and we agree, that this argument is forfeited as defendants did not raise this issue before the trial court. *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 59. Even if we were to interpret the issue as having been preserved by defendants' broad arguments regarding void contracts, defendants' contention nevertheless fails.

¶ 48    The Illinois Supreme Court has the inherent power to define and regulate the practice of

12

law. *Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040, ¶ 14. "There is no mechanistic formula to define what is and what is not the practice of law." *Id.* ¶ 15. Rather, courts examine the character of the acts themselves to determine if the conduct is the practice of law. *Id.* Our supreme court has stated that "[t]he practice of law involves not only appearance in court in connection with litigation but also services rendered out of court, and it includes the giving of advice or the rendering of any services requiring the use of legal skill or knowledge, such as preparing a will, contract or other instrument, the legal effect of which, under the facts and conditions involved, must be carefully determined." *People ex rel. Illinois State Bar Ass'n v. Schafer*, 404 Ill. 45, 50 (1949).

¶ 49    Andrew does not appear to have rendered any services requiring legal skill or knowledge. See *id.* As reflected in the parties' agreement and as supported by the record, Andrew provided advice regarding the proper work on the roof in his capacity as a licensed roofer. Koretge, the general contractor retained by Travelers, viewed Andrew as knowledgeable and skilled regarding commercial roofs. When presented with a legal issue – *i.e.*, the structuring of the parties' agreement – Andrew consulted with legal counsel.

¶ 50    Our supreme court's rules regarding the practice of law are intended to safeguard the public from individuals unqualified to practice law and to ensure the integrity of our legal system. *Downtown Disposal Services*, 2012 IL 112040, ¶ 14. Under the circumstances of this case, we cannot find that Andrew's conduct raised any such concerns.

¶ 51                                    *Unclean Hands*

¶ 52    Defendants next assert that Andrew's unclean hands prevent him from obtaining an equitable award. "The unclean hands doctrine prevents a plaintiff – any plaintiff – who engages in misconduct, fraud or bad faith directed at the defendant in connection with the matter being

litigated from receiving any relief from a court of equity." *Prospect Development, LLC v. Kreger*, 2016 IL App (1st) 150433, ¶ 36. According to defendants, Andrew: (a) failed to disclose certain conflicts of interest, *e.g.*, that Vojtek was his employee's former spouse; (b) never explained the significance of switching from a first-party public adjuster to a third-party roofing consultant; (c) failed to disclose certain aspects of the agreement, including the 33% contingency fee structure; and (d) attempted to coerce Roger into sending correspondence to Travelers containing inflated amounts.

¶ 53    The doctrine of unclean hands is applied at the trial court's discretion and thus cannot be disturbed on appeal absent a determination that the trial court abused its discretion. *Jameson Real Estate*, 2018 IL App (1st) 171534, ¶ 84. In the instant case, there is no indication that the trial court abused its discretion. The allegations of Andrew's wrongdoing are primarily based on Roger's representations and assessments. At the conclusion of the trial, however, the court expressly found Roger to be "not credible" and Andrew to be "generally credible." The trial court was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony. *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859. Even assuming that the trial court did not have concerns regarding Roger's credibility, none of the alleged misconduct rises to a level of fraud or bad faith which would support the application of the doctrine of unclean hands. See *Jameson Real Estate*, 2018 IL App (1st) 171534, ¶ 83.

¶ 54                    *Contract Termination and the Calculation of Damages*

¶ 55    In his cross-appeal, Andrew contends that the trial court erred as a matter of law when it found in favor of defendants on his breach of contract claim. Prior to the bench trial, the court found that the February 2016 letter constituted effective termination but did not negate defendants' obligations as to the performance rendered prior to the termination. The trial court

ultimately awarded damages under a *quantum meruit* theory, finding that Andrew was entitled to 33% of the difference between Travelers' initial offer and its final offer (as opposed to 33% of the total recovery, as provided in the contract).

¶ 56    As an initial matter, we agree with the trial court's finding that the letter from Roger in February 2016 effectively terminated the parties' agreement. "It has long been recognized that contracts of indefinite duration are generally terminable at the will of the parties." *Jespersen v. Minnesota Mining & Manufacturing Co.*, 183 Ill. 2d 290, 291 (1998). We also agree with the trial court's assessment that Andrew was entitled to compensation for the services he performed prior to the termination. In the absence of a contractual remedy, an action in quasi-contract, such as *quantum meruit*, is available. See *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 32.

¶ 57    *Quantum meruit* – which literally means "as much as he deserves" – describes a cause of action seeking recovery for the reasonable value of services which were non-gratuitously rendered. *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010). In order to recover under this doctrine, Andrew must prove that the services he performed were of some measurable benefit to defendants. See *id.* The record supports the conclusion that Travelers significantly increased its offer to defendants due, at least in part, to Andrew's efforts. The trial court in the instant case awarded Andrew a fraction of the amount by which Travelers increased its offer to defendants during the course of their communications: $89,265 plus costs. We may not reverse the trial court's finding as to the reasonable value of a plaintiff's services unless the finding is manifestly erroneous. *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 606 (1999). Given the lack of any affirmative showing to the contrary in the record, we hold that the trial court's finding as to the reasonable value of

Andrew's services is not manifestly erroneous. See *id.*[2]

¶ 58                                     *Fraudulent Misrepresentation*

¶ 59    Andrew alleged in count IV of his complaint that Roger fraudulently misrepresented his ownership of the building and his ability to bind Churchill Cabinet and Chicago Gaming to the roof damage consulting agreement. On appeal, Andrew contends that the trial court incorrectly ruled in defendants' favor as to this count.

¶ 60    "In order for a plaintiff to prevail on a claim of fraudulent misrepresentation, he or she must establish the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 228 Ill. 2d 324, 342-43 (2008). As noted above, the standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence. *Jameson Real Estate*, 2018 IL App (1st) 171534, ¶ 59.

¶ 61    Among other things, the record does not suggest that Andrew was damaged by his reliance on Roger's alleged misrepresentations regarding his ownership and ability to contractually bind the other defendants. Rather, Andrew was damaged by defendants' termination of the contract and refusal to pay him for his services. We thus conclude that the trial court's ruling as to the fraudulent misrepresentation count was not against the manifest weight of the evidence.

¶ 62                                     CONCLUSION

¶ 63    For the reasons discussed above, the judgment of the circuit court of Cook County is

---

[2] As we affirm the trial court's award of *quantum meruit* damages, we need not consider Andrew's alternative arguments based on a theory of unjust enrichment.

16

affirmed in its entirety.

¶ 64    Affirmed.